# EXHIBIT 2

**CPT**Group
Class Action Administrators

## CASE NAME: RELOJ V. GEICO

| | | | |
|---|---|---|---|
| **Requesting Attorney:** | Rocio D Espinoza | **Date:** | May 22, 2025 |
| **Plaintiff or Defense:** | Plaintiff | **Prepared By:** | Dominique Fite, Esq. |
| **Firm Name:** | Schneider Wallace Cottrell Konecky LLP | | 50 Corporate Park, Irvine CA 92606 |
| **Telephone:** | (415) 421-7100 | | DFite@CPTGroup.com |
| **Email:** | respinoza@schneiderwallace.com | **Direct Number:** | (619) 613-1653 |
| | | **Main Number:** | (800) 542-0900 |

### FLSA/RULE 23 PROJECT ASSUMPTIONS & ADMINISTRATIVE COSTS

| | | | |
|---|---|---|---|
| **Total Class Size:** | **835** | **Settlement Website:** | Static Website |
| FLSA Class Size: | 835 | **Notice Procedures:** | Mail Email & Reminder |
| FLSA Additional Payment Class: | 28 | **Undeliverable Mail Rate:** | 8% |
| Opt-In Filing Rate: | 30% | **Payment Option:** | Check |
| RULE 23 Class Members: | 835 | **Unclaimed Funds:** | Redistribution |
| RULE 23 Opt-Out Rate: | 1.5% | **Postage Total:** | $2,287.70 |
| PAGA Class Members: | 835 | **Grand Total:** | $28,745.29 |
| **Total Number of Checks Issued:** | **835** | **CPT'S DISCOUNTED FEE:** | **$23,000.00** |
| **Language Translation Services:** | **No** | | |

The services and numbers reflected herein are estimates based on the information provided by counsel at the time of this Bid. If the actual services and numbers are different, our cost estimate will change accordingly. Client expressly acknowledges and agrees that estimated fees and costs may fluctuate and agrees to pay for any such increases to such estimates as if set forth herein.

The attached Terms and Conditions are included as part of and incorporated by reference to our cost proposal. By accepting our cost proposal for this matter, you are thereby agreeing to the Terms and Conditions.

## CASE SETUP

After receiving the data, CPT will scrub all records to eliminate duplicates and anomalies; this process is designed to achieve a higher success percentage in delivering the Class Notice. Each Class Member will receive a unique mailing ID that will be utilized for all administrative purposes. The Settlement Website will publish the full Notice and all relevant case documents for downloading.

| ADMINISTRATIVE TASKS | UNIT PRICE | PIECES/HOURS | COST ESTIMATE |
|---|---|---|---|
| Project Manager: Case Intake & Review | $95.00 | 7 | $665.00 |
| Programming: Data Base Setup | $150.00 | 7 | $1,050.00 |
| Static Website | $500.00 | 1 | $500.00 |
| | | **Sub Total:** | **$2,215.00** |

## DIRECT EMAIL NOTIFICATION

Counsel estimates that Defendant will provide email addresses for all Class Members. Before email notification, CPT will perform a third-party email validation scan to improve the success rate of deliverability and reduce the number of undeliverable emails.

| ADMINISTRATIVE TASKS | UNIT PRICE | PIECES/HOURS | COST ESTIMATE |
|---|---|---|---|
| Project Manager-Email Notice Format | $95.00 | 2 | $190.00 |
| Third-Party Email Validation | $0.50 | 835 | $417.50 |
| Email Notification: Setup/Establish/Formatting | $150.00 | 3 | $450.00 |
| Email Notification: Segmentation/Sending | $150.00 | 4 | $600.00 |
| Email Notification: Reporting/Monitoring | $250.00 | 2 | $500.00 |
| Email Summary Notices: Initial Notification (100%) | $0.16 | 835 | $133.60 |
| Updated Database: Undeliverable Email (10%) | $0.16 | 84 | $13.36 |
| | | **Sub Total:** | **$2,304.46** |

## DIRECT MAIL NOTIFICATION

CPT will perform an address update via NCOA and, if necessary, conduct an additional skip trace in order to ensure that mail is delivered to the most current address possible. A detailed notice and a one-page claim form will be mailed to FLSA class members, and a notice and exclusion form will be sent to RULE 23 class members. Twenty-eight collective memebers will be eligible to an additional settlement payment and will receive a supplemental notice (5-page notice and 1-page Opt-In). Documents will be mailed via U.S. mail.

| ADMINISTRATIVE TASKS | UNIT PRICE | PIECES/HOURS | COST ESTIMATE |
|---|---|---|---|
| Project Manager: Format Documents | $95.00 | 2 | $190.00 |
| National Change of Address Search (NCOA) | $135.00 | 1 | $135.00 |
| XML Lex ID Skip Trace | $0.85 | 84 | $71.40 |
| Print & Mail Notice Packets | $1.25 | 835 | $1,043.75 |
| Print & Mail Notice Packets - FLSA Additional Notice | $1.25 | 28 | $35.00 |
| First-Class Postage (up to 1 oz.)* | $0.69 | 863 | $595.47 |
| | | **Sub Total:** | **$2,070.62** |

*Postage costs are subject to change at anytime. The final rate will be determined at the time of mailing.

# PROCESS RETURNED UNDELIVERABLE MAIL

According to CPT's historical data, 8% of the notices will be undeliverable. Upon notification from USPS, CPT will perform a skip trace to locate a current address. Typically 70% of the undeliverable notice packets are eligible for remail with an updated address.

| ADMINISTRATIVE TASKS | UNIT PRICE | PIECES/HOURS | COST ESTIMATE |
|---|---|---|---|
| Clerical Staff | $60.00 | 2 | $120.00 |
| Update Undeliverable Mail Database | $0.50 | 67 | $33.50 |
| Skip Trace for Best Address | $1.00 | 60 | $60.00 |
| Print & Remail Notice Packets | $1.25 | 47 | $58.75 |
| First-Class Postage (up to 1 oz.) | $0.69 | 47 | $32.43 |
| | | Sub Total: | $304.68 |

# CLAIMS & EXCLUSION FORM PROCESSING

CPT will examine the submissions to identify and remove duplicates, fraudulent responses, or otherwise invalid claims submissions. CPT will process and verify claims, opt-outs, objections, and other responses submitted by class members. Deficient responses will be sent a follow-up notice, offering the class member a chance to cure.

| ADMINISTRATIVE TASKS | UNIT PRICE | PIECES/HOURS | COST ESTIMATE |
|---|---|---|---|
| Programming: De-duplication/Scrubbing | $150.00 | 5 | $750.00 |
| Project Manager: Validate Claims | $95.00 | 2 | $190.00 |
| Clerical Staff | $60.00 | 5 | $300.00 |
| Claims & Opt-Out Processing | $2.50 | 263 | $657.56 |
| Print & Mail Deficiency/Dispute Notices | $1.50 | 14 | $21.00 |
| First-Class Postage (up to 1 oz.) | $0.69 | 14 | $9.66 |
| Review & Process Deficiency Responses | $10.00 | 7 | $70.00 |
| | | Sub Total: | $1,998.22 |

# CLASS MEMBER SUPPORT

CPT will establish a toll-free telephone number equipped with interactive voice response (IVR) capabilities and live customer support representatives. Live support will be available during regular business hours, Monday to Friday, 9:00 AM to 5:30 PM, Pacific Time (PT). The dedicated case phone number shall be operational for a maximum of 120 days following the disbursement.

| ADMINISTRATIVE TASKS | UNIT PRICE | PIECES/HOURS | COST ESTIMATE |
|---|---|---|---|
| Toll-Free Number Establish/Setup | $150.00 | 2 | $300.00 |
| Live Call Center Support Reps. | $3.00 | 126 | $378.00 |
| | | Sub Total: | $678.00 |

# SSN VERIFICATION

Authenticate Social Security Number for validity using IRS verification processes and/or IRS backup withholdings processes.

| ADMINISTRATIVE TASKS | UNIT PRICE | PIECES/HOURS | COST ESTIMATE |
|---|---|---|---|
| Programming: SSN Selection | $150.00 | 1 | $150.00 |
| Department Manager: Analysis & Reporting | $95.00 | 3 | $285.00 |
| IRS SSN Verification | $0.10 | 835 | $83.50 |
| | | Sub Total: | $518.50 |

# DISTRIBUTION SERVICES

CPT will establish a 26 CFR § 1.468B-1 compliant Qualified Settlement Fund (QSF). Upon Final Approval, CPT will perform the required settlement payment calculations and once approved by the parties, CPT will issue a (MICR) check to all eligible claimants. CPT will also issue an IRS Form 1099 and/or IRS Form W2 when applicable. CPT utilizes the bank's Payee Positive Pay to prevent check fraud and performs monthly account reconciliations for the QSF bank account. Undeliverable checks are skip traced to obtain a current address and are remailed accordingly. Requests for check reissues will be processed throughout the check cashing period. CPT's administration of the QSF will continue for a maximum duration of one year following the initial distribution of funds. Reminder notice will be sent via email, mail, and phone call.

| ADMINISTRATIVE TASKS | UNIT PRICE | PIECES/HOURS | COST ESTIMATE |
|---|---|---|---|
| Programming: Calculation Totals | $150.00 | 3 | $450.00 |
| Project Supervisor: Review of Distribution | $150.00 | 3 | $450.00 |
| Project Manager: Correspondence w/Parties | $95.00 | 2 | $190.00 |
| Programming: Setup & Printing of Checks | $150.00 | 3 | $450.00 |
| Obtain EIN, Setup QSF/Bank Account | $150.00 | 3 | $450.00 |
| Print & Mail Notice, Checks & W2/1099 | $2.50 | 835 | $2,087.50 |
| First-Class Postage (up to 1 oz.)* | $0.69 | 835 | $576.15 |
| Project Supervisor: Account Reconciliation | $150.00 | 12 | $1,800.00 |
| Update Undeliverable Checks Database | $0.50 | 42 | $20.88 |
| Skip Trace for Best Address | $1.00 | 42 | $41.75 |
| Remail Undeliverable Checks | $2.50 | 38 | $95.00 |
| First-Class Postage (up to 1 oz.) | $0.69 | 38 | $26.22 |
| Re-Issue Checks as Required | $5.00 | 34 | $170.00 |
| First-Class Postage (up to 1 oz.) | $0.69 | 34 | $23.46 |
| Project Manager-Email Notice Format | $95.00 | 1 | $95.00 |
| Email Reminder Notification: Setup/Formatting | $150.00 | 2 | $300.00 |
| Email ReminderNotification: Segmentation/Sending | $150.00 | 2 | $300.00 |
| Email Reminder Notification: Reporting/Monitoring | $250.00 | 1 | $250.00 |
| Email Reminder Notices | $0.16 | 668 | $106.88 |
| Print & Mail 1-Page Reminder Notice | $1.00 | 668 | $668.00 |
| First-Class Postage (up to 1 oz.)* | $0.69 | 668 | $460.92 |
| RoboDial Setup/Establish/Monitor | $250.00 | 1 | $250.00 |
| RoboCall Reminder | $0.55 | 501 | $275.55 |
| | | **Sub Total:** | **$9,537.31** |

*Postage costs are subject to change at anytime. The final rate will be determined at the time of mailing.

# REDISTRIBUTION SERVICES

CPT will establish a 26 CFR § 1.468B-1 compliant Qualified Settlement Fund (QSF). Upon Final Approval, CPT will perform the required settlement payment calculations and once approved by the parties, CPT will issue a (MICR) check to all eligible claimants. CPT will also issue an IRS Form 1099 and/or IRS Form W2 when applicable. CPT utilizes the bank's Payee Positive Pay to prevent check fraud and performs monthly account reconciliations for the QSF bank account. Undeliverable checks are skip traced to obtain a current address and are remailed accordingly. Requests for check reissues will be processed throughout the check cashing period. CPT's administration of the QSF will continue for a maximum duration of one year following the initial distribution of funds.

| ADMINISTRATIVE TASKS | UNIT PRICE | PIECES/HOURS | COST ESTIMATE |
|---|---|---|---|
| Programming: Calculation Totals | $150.00 | 3 | $450.00 |
| Project Supervisor: Review of Distribution | $150.00 | 3 | $450.00 |
| Project Manager: Correspondence w/Parties | $95.00 | 2 | $190.00 |
| Programming: Setup & Printing of Checks | $150.00 | 3 | $450.00 |
| Print & Mail Notice, Checks & W2/1099 | $2.50 | 752 | $1,878.75 |
| First-Class Postage (up to 1 oz.)* | $0.69 | 752 | $518.54 |
| Project Supervisor: Account Reconciliation | $150.00 | 12 | $1,800.00 |
| Update Undeliverable Checks Database | $0.50 | 38 | $18.79 |
| Skip Trace for Best Address | $1.00 | 38 | $37.58 |
| Remail Undeliverable Checks | $2.50 | 34 | $85.00 |
| First-Class Postage (up to 1 oz.) | $0.69 | 34 | $23.46 |
| Re-Issue Checks as Required | $5.00 | 31 | $155.00 |
| First-Class Postage (up to 1 oz.) | $0.69 | 31 | $21.39 |
| | | **Sub Total:** | **$6,078.50** |

*Postage costs are subject to change at anytime. The final rate will be determined at the time of mailing.

# TAX REPORTING & SETTLEMENT CONCLUSION

CPT prepares annual tax reporting on behalf of the QSF and Federal and State taxes in accordance with current state and federal regulations. All parties will be furnished with weekly and final reports. A declaration attesting to due process will be provided to all parties. Unclaimed funds will revert to a Cy Pres designated by the parties.

| ADMINISTRATIVE TASKS | UNIT PRICE | PIECES/HOURS | COST ESTIMATE |
|---|---|---|---|
| Project Supervisor: Reconcile Uncashed Chk | $150.00 | 1 | $150.00 |
| Programming: Weekly & Final Reports | $150.00 | 2 | $300.00 |
| Project Supervisor: Final Declaration | $150.00 | 2 | $300.00 |
| Project Manager: Account Files Sent to Atty | $95.00 | 2 | $190.00 |
| CA Tax Preparation* | $600.00 | 1 | $600.00 |
| Annual Tax Reporting to IRS* | $1,000.00 | 1 | $1,000.00 |
| QSF Annual Tax Reporting | $500.00 | 1 | $500.00 |
| Unclaimed Funds Revert to Cy Pres | Included | 1 | Included |
| | | **Sub Total:** | **$3,040.00** |

*CPT will file Federal and California taxes in accordance with current state and federal regulations. Additional charges will apply if the Settlement/Order/parties require(s) multiple state tax filings.

| | |
|---|---|
| **Total Administration Costs:** | **$28,745.29** |
| *Courtesy Discount:* | *-$5,745.29* |
| **CPT'S DISCOUNTED FLAT FEE:** | **$23,000.00** |

# TERMS AND CONDITIONS

These Terms and Conditions ("**Terms and Conditions**") are made a part of, and incorporated by reference into, any Bid presented by CPT Group, Inc. ("**CPT**") to Client. Each of Client and CPT is a "**Party**" to this Agreement, and collectively, the "**Parties**".

1. Definitions.

   a) "**Affiliate**" means a party that partially (at least 50%) or fully controls, is partially or fully controlled by, or is under partial (at least 50%) or full common control with another party.

   b) "**Agreement**" means these Terms and Conditions and the Bid.

   c) "**Applicable Laws**" means all applicable local, state and federal laws, ordinances, rules and regulations.

   d) "**Approved Bank**" means any financial institution that is insured by the Federal Deposit Insurance Corporation.

   e) "**Bid**" means a proposal, statement of work, order form, and/or schedule for Services (including any and all addendums, exhibits, or amendments thereto) provided by CPT to Client.

   f) "**Case**" means the case referred to in the attached Bid and/or the particular judicial matter identified by the name of plaintiff(s) and defendant(s) on the caption of the applicable Court Order.

   g) "**Class**" means Members and putative Members collectively.

   h) "**Client**" means the party or parties engaging CPT for Services as set forth in the Bid, namely Plaintiff Counsel and/or Defense Counsel.

   i) "**Confidential Information**" means any non-public information of CPT or Client disclosed by either Party to the other Party, either directly or indirectly, in writing, orally or by inspection of tangible objects, or to which the other Party may have access, which a reasonable person would consider confidential and/or which is marked "confidential" or "proprietary" or some similar designation by the disclosing Party. Confidential Information shall also include the terms of this Agreement, except where this Agreement specifically provides for disclosure of certain items. Confidential Information shall not, however, include the existence of the Agreement or any information which the recipient can establish: (i) was or has become generally known or available or is part of the public domain without direct or indirect fault, action, or omission of the recipient; (ii) was known by the recipient prior to the time of disclosure, according to the recipient's prior written documentation; (iii) was received by the recipient from a source other than the discloser, rightfully having possession of and the right to disclose such information; or (iv) was independently developed by the recipient, where such independent development has been documented by the recipient.

   j) "**Court Order**" means a legal command or direction issued by a court, judicial office, or applicable administrative body requiring one or more Parties To The Case to carry out a legal obligation pursuant to the Case.

   k) "**Defendant**" means the named Party and/or Parties in the Case against whom action is brought.

   l) "**Defense Counsel**" means the attorney(s) of record for the Defendant(s) in the Case.

   m) "**Intellectual Property Right**" means any patent, copyright, trade or service mark, trade dress, trade name, database right, goodwill, logo, trade secret right, or any other intellectual property right or proprietary information right, in each case whether registered or unregistered, and whether arising in any jurisdiction, including without limitation all rights of registrations, applications, and renewals thereof and causes of action for infringement or misappropriation related to any of the foregoing.

   n) "**Member**" means an individual who is eligible under the Case or Class to receive a communication about their pending legal rights under the matter and/or designated amount of the Settlement, including the named Plaintiff(s) in the Case and all other putative persons or other parties in the representative action so designated or addressed therein.

   o) "**Member Content**" means all Member written document communications relating to the Case, including claim forms, opt-out forms, and/or objections, which may contain Member Data.

   p) "**Member Data**" means proprietary or personal data regarding Members under this Agreement.

   q) "**Parties To The Case**" shall mean collectively Defendant(s) and Plaintiff(s) as defined in the Settlement Agreement or Court Order.

   r) "**Plaintiff**" means the named party and/or parties in the Case who are bringing the action.

   s) "**Plaintiff Counsel**" means the attorney(s) of record for Plaintiff(s) in the Case, and/or upon certification by the Court the attorney(s) of record designated to represent the Class.

   t) "**Products**" means any and all CPT Services and work product resulting from Services.

   u) "**Qualified Settlement Fund**" or "**QSF**" means a bank account established pursuant to U.S. Department of Treasury Regulations §1468B-1.

   v) "**Service**" means any service rendered by CPT specifically to Client, including, but not limited to: (i) notifications to Members; (ii) setting up a QSF with an Approved Bank; (iii) management of disbursement of funds from the QSF to applicable parties pursuant to the Settlement Agreement; (iv) provision of customer support relating to the Case; (v) management of Case claim forms and correspondence; and/or (vi) any administrative or consulting service.

   w) "**Settlement Agreement**" means the contract between Parties To The Case to resolve the same, which specifies amounts to be disbursed from the Qualified Settlement Fund to attorneys, CPT, and individual Members.

   x) "**Settlement Amount**" means the total dollar amount agreed to between Parties To The Case to resolve the Case to mutual satisfaction.

   y) "**Software**" means any and all of CPT's software applications, including, without limitation, all updates, revisions, bug-fixes, upgrades, and enhancements thereto.

   z) "**Transmission Methods**" means the secure authorized manner to send Member Data and/or Wire Information as specified on a schedule or exhibit hereto.

   aa) "**Term**" means the period commencing on the date set forth on the Bid and continuing until the date of final judgment (if a settlement) or upon completion of all Services as set forth in the Bid.

   bb) "**Wire Information**" means instructions for (i) Defense Counsel to transfer funds from Defendant to the Qualified Settlement Fund or (ii) CPT to transfer funds from the Qualified Settlement Fund to applicable parties pursuant to the Settlement Agreement.

2. Client Obligations. Client will ensure that it has obtained all necessary consents and approvals for CPT to access and use Member Data for the purposes permitted under this Agreement and shall only transmit Member Data and/or Wire Information to CPT via the Transmission Methods. Client shall use and maintain appropriate administrative, technical, and physical safeguards designed to protect Member Data provided under this Agreement. Client further warrants that any Member Data, Wire Information, or other content, data, materials or information it transmits shall be free of viruses, worms, Trojan horses, or other harmful or disenabling codes which could adversely affect Member Data and/or CPT. If Client is in breach of this section, CPT may suspend Services, in addition to any other rights and remedies CPT may have at law or in equity.

3. CPT Obligations. CPT will (i) maintain appropriate safeguards designed to protect Member Data, including regular back-ups, security and incident response protocols, and (ii) not access or disclose Member Data except (A) as compelled by law, (B) to prevent or address service or technical issues, (C) in accordance with this Agreement or the provisions of the Settlement Agreement, or (D) if otherwise permitted by Parties To The Case, Members, Plaintiff Counsel or Defense Counsel as applicable.

4. Security. Client and CPT shall each use reasonable administrative, technical, and physical safeguards that are reasonably designed to: (a) protect the security and confidentiality of any Member Data in its possession or control under this Agreement; (b) protect against any anticipated threats or hazards to the security or integrity of such Member Data; (c) protect against unauthorized access to or use of such Member Data that could result in substantial harm or inconvenience to any individual; and (d) protect against unauthorized access to or use of such Member Data in connection with its disposal.

   a) Incident Notification. In the event a Party discovers that Member Data relating to the Case is the subject of (i) any unauthorized acquisition, loss, access or use and/or (ii) an actual or suspected breach concerning such Party's systems (items (i) and/or (ii) a "**Security Incident**"), or a Party has a reasonable belief that a Security Incident has occurred or is at risk of occurring, such Party will promptly but no later than forty-eight (48) hours of its discovery of such circumstances, inform the other Parties in the event of such Security Incident, and shall utilize best efforts to assist the other Parties to mitigate the effects of such Security Incident.

   b) b) Response Procedures. In the event of a Security Incident, the breached party shall (i) cooperate with any reasonable investigation concerning the Security Incident by the other Parties, regulators and/or law enforcement; and (ii) cooperate with the other Parties to comply with Applicable Laws concerning such Security Incident, including any notification to affected individuals. The Parties acknowledge that the breached party in any Security Incident shall be the Party responsible for

any and all remedies and costs under Applicable Laws concerning such Security Incident, unless such breach occurred due to another Party's actions hereunder, in which instance such party shall be comparatively responsible for all remedies and costs. In no event will any Party serve notice or otherwise publicize a Security Incident without the prior written consent of the other Parties. The Parties shall reasonably cooperate and coordinate with each other to respond to the Security Incident, including with regard to the content of notification to affected individuals.

6. Qualified Settlement Fund Account. When the Case has a Settlement Amount CPT shall be authorized to establish one or more QSF bank accounts at an Approved Bank if and as applicable to the Services as set forth in the Bid. The amounts held at the Approved Bank under this Agreement are at the sole risk of Defendant. Without limiting the generality of the foregoing, CPT shall have no responsibility or liability for any diminution of the funds that may result from the deposit thereof at the Approved Bank, including deposit losses, credit losses, or other claims made against the Approved Bank. It is acknowledged and agreed that CPT has acted reasonably and prudently in depositing funds at an Approved Bank, and CPT is not required to conduct diligence or make any further inquiries regarding such Approved Bank.

7. Fees and Payment. Pricing for Services is as stated on the Bid, and Client agrees to pay CPT in the amounts set forth on the Bid. Client will be invoiced per the schedule set forth in the Bid, and payment of fees will be due within 30 days after the date of the invoice, except where the Bid or terms of the Settlement Agreement or Court Order expressly prescribes other payment dates. All fees set forth in a Bid are in U.S. dollars, must be paid in U.S. dollars, and are exclusive of taxes and applicable transaction processing fees. Late payments hereunder will incur a late charge of 1.5% per month (or the highest rate allowable by law, whichever is lower) on the outstanding balance from the date due until the date of actual payment, which such late charge(s) may be charged against the QSF account if incurred in connection with Services provided pursuant to administration of a settlement. In addition, Services are subject to suspension for failure to timely remit payment therefor. If travel is required to effect Services, Client shall reimburse CPT for pre-approved, reasonable expenses arising from and/or relating to such travel, including, but not limited to, airfare, lodging, meals, and ground transportation. . In connection with CPT's administration of a QSF, unless otherwise stated in the Settlement Agreement or Court Order concerning disbursement of unclaimed funds in the QSF account, CPT reserves the right, after one (1) year of issuance of disbursements to Members, to classify any remaining balance in such QSF account as additional administrative fees payable to CPT until such time as the QSF account balance becomes zero ($0.00), and thereafter close such account.

8. Term and Termination.

   a) Term. The Term is set forth in the Bid. The Agreement may be renewed by mutual written agreement of the parties.

   b) Termination for Cause. Either Party may immediately terminate this Agreement if the other Party materially breaches its obligations hereunder, and, where capable of remedy, such breach has not been materially cured within forty-five (45) days of the breaching Party's receipt of written notice describing the breach in reasonable detail.

   c) Bankruptcy Events. A Party may immediately terminate this Agreement if the other Party: (i) has a receiver appointed over it or over any part of its undertakings or assets; (ii) passes a resolution for winding up (other than for a bona fide scheme of solvent amalgamation or reconstruction), or a court of competent jurisdiction makes an order to that effect and such order is not discharged or stayed within ninety (90) days; or (iii) makes a general assignment for the benefit of its creditors.

   d) Effect of Termination. Immediately following termination of this Agreement, upon written request, Member Data may be retrieved via the secure FTP site in the same format in which the Member Data was originally inputted into the Software, at no additional charge. Alternatively, Member Data can be returned in a mutually agreed format at a scope and price to be agreed upon. CPT will maintain a copy of Member Data and Member Content for no more than four (4) years following the date of the final check cashing deadline for Members under the Settlement Agreement, after which time any Member Data and Member Content not retrieved will be destroyed.

   e) Final Payment. If Client terminates this Agreement due to Section "Termination", Client shall pay CPT all fees owed through the termination date. If CPT terminates the Agreement in accordance with Section "Termination," Client shall pay CPT all fees invoiced through the termination date, plus all fees remaining to be invoiced during the Term, less any costs CPT would have incurred had the Agreement not been terminated.

9. Confidentiality. Each Party agrees: (i) not to disclose any Confidential Information to any third parties except as mandated by law and except to those subcontractors of CPT providing Products hereunder who agree to be bound by confidentiality obligations no less stringent than those set forth in this Agreement; (ii) not to use any Confidential Information for any purposes except carrying out such Party's rights and responsibilities under this Agreement; and (iii)

to keep the Confidential Information confidential using the same degree of care such Party uses to protect its own confidential information; provided, however, that such Party shall use at least reasonable care. These obligations shall survive termination of this Agreement.

   a) Compelled Disclosure. If receiving Party is compelled to disclose any Confidential Information by judicial or administrative process or by other requirements of law, such Party shall (i) promptly notify the other Party, (ii) reasonably cooperate with the other Party in such Party's efforts to prevent or limit such compelled disclosure and/or obtain confidential treatment of the items requested to be disclosed, and (iii) shall disclose only that portion of such information which each Party is advised by its counsel in writing is legally required to be disclosed.

   b) Remedies. If either Party breaches any of its obligations with respect to confidentiality or the unauthorized use of Confidential Information hereunder, the other Party shall be entitled to seek equitable relief to protect its interest therein, including but not limited to, injunctive relief, as well as money damages.

10. Intellectual Property. CPT retains all right, title and interest (including, without limitation, all Intellectual Property Rights) in and to the Products. CPT does not claim any ownership rights to Member Data.

11. Indemnification. Client agrees to indemnify, defend, and hold harmless CPT, its Affiliates, and the respective officer, directors, consultants, employees, and agents of each (collectively, "**Covered CPT Parties**") from and against any and all third party claims and causes of action, as well as related losses, liabilities, judgments, awards, settlements, damages, expenses and costs (including reasonable attorney's fees and related court costs and expenses) (collectively, "**Damages**") incurred or suffered by CPT which directly relate to or directly arise out of (i) Client's breach of this Agreement; (ii) CPT's performance of Services hereunder; (iii) the processing and/or handling of any payment by CPT; (iv) any content, instructions, information or Member Data provided by Client to CPT in connection with the Services provided by CPT hereunder. The foregoing provisions of this section shall not apply to the extent the Damages relate to or arise out of CPT's willful misconduct. To obtain indemnification, indemnitee shall: (i) give written notice of any claim promptly to indemnitor; (ii) give indemnitor, at indemnitor's option, sole control of the defense and settlement of such claim, provided that indemnitor may not, without the prior consent of indemnitee (not to be unreasonably withheld), settle any claim unless it unconditionally releases indemnitee of all liability; (iii) provide to indemnitor all available information and assistance; and (iv) not take any action that might compromise or settle such claim.

12. Warranties. Each Party represents and warrants to the other Party that, as of the date hereof: (i) it has full power and authority to execute and deliver the Agreement; (ii) the Agreement has been duly authorized and executed by an appropriate employee of such Party; (iii) the Agreement is a legally valid and binding obligation of such Party; and (iv) its execution, delivery and/or performance of the Agreement does not conflict with any agreement, understanding or document to which it is a party. CPT WARRANTS THAT ANY AND ALL SERVICES PROVIDED BY IT HEREUNDER SHALL BE PERFORMED IN A PROFESSIONAL MANNER CONSISTENT WITH PREVAILING INDUSTRY STANDARDS. TO THE EXTENT PERMITTED BY APPLICABLE LAW, CPT DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT AND ANY WARRANTIES ARISING FROM A COURSE OF DEALING, USAGE OR TRADE PRACTICE

13. Liability.

   a) Liability Cap. EXCEPT FOR A PARTY'S GROSSS NEGLIGENCE OR WILLFUL MISCONDUCT, EACH PARTY'S MAXIMUM AGGREGATE LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT, REGARDLESS OF THE THEORY OF LIABILITY, WILL BE LIMITED TO THE TOTAL FEES PAID OR PAYABLE BY CLIENT AND/OR THE PARTIES TO THE CASE TO CPT HEREUNDER. THE EXISTENCE OF MORE THAN ONE CLAIM SHALL NOT EXPAND SUCH LIMIT. THE PARTIES ACKNOWLEDGE THAT THE FEES AGREED UPON BETWEEN CLIENT AND CPT ARE BASED IN PART ON THESE LIMITATIONS, AND THAT THESE LIMITATIONS WILL APPLY NOTWITHSTANDING ANY FAILURE OF ANY ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. THE FOREGOING LIMITATION SHALL NOT APPLY TO A PARTY'S PAYMENT OBLIGATIONS UNDER THE AGREEMENT.

   b) Exclusion of Consequential Damages. NEITHER PARTY WILL BE LIABLE FOR LOST PROFITS, LOST REVENUE, LOST BUSINESS OPPORTUNITIES, LOSS OF DATA, INTERRUPTION OF BUSINESS, OR ANY OTHER INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT, REGARDLESS OF THE THEORY OF LIABILITY, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

14. Communications. CPT may list Client's name and logo alongside CPT's other clients on the CPT website and in marketing materials, unless and until Client revokes such permission. CPT may also list the Case name and/or number, and

certain Qualified Settlement Fund Information, on the CPT website and in marketing materials, unless stated otherwise in the Settlement Agreement.

15.  Miscellaneous Provisions.

a)  Governing Law; Jurisdiction.  This Agreement will be governed by and construed in accordance with the laws of the State of California and the federal laws of the United States of America, without regard to conflict of law principles.  CPT and Client agree that any suit, action or proceeding arising out of, or with respect to, this Agreement or any judgment entered by any court in respect thereof shall be brought exclusively in the state or federal courts of the State of California located in the County of Orange, and each of CPT and Client hereby irrevocably accepts the exclusive personal jurisdiction and venue of those courts for the purpose of any suit, action or proceeding.

b)  Force Majeure.  Neither Party will be liable for any failure or delay in its performance under this Agreement due to any cause beyond its reasonable control, including without limitation acts of war, acts of God, earthquake, flood, weather conditions, embargo, riot, epidemic, acts of terrorism, acts or omissions of vendors or suppliers, equipment failures, sabotage, labor shortage or dispute, governmental act, failure of the Internet or other acts beyond such Party's reasonable control, provided that the delayed Party: (i) gives the other Party prompt notice of such cause; and (ii) uses reasonable commercial efforts to correct promptly such failure or delay in performance.

c)  Counterparts.  This Agreement may be executed in any number of counterparts and electronically, each of which shall be an original but all of which together shall constitute one and the same instrument.

d)  Entire Agreement.  This Agreement contains the entire understanding of the parties in respect of its subject matter and supersedes all prior agreements and understandings (oral or written) between the Parties with respect to such subject matter.  The schedules and exhibits hereto constitute a part hereof as though set forth in full herein.

e)  Modifications.  Any modification, amendment, or addendum to this Agreement must be in writing and signed by the Parties.

f)  Assignment.  Neither Party may assign this Agreement or any of its rights, obligations,  or benefits hereunder, by operation of law or otherwise, without the other Party's prior written consent; provided, however, either Party, without the consent of the other Party, may assign this Agreement to an Affiliate or to a successor (whether direct or indirect, by operation of law, and/or by way of purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of such Party, where the responsibilities or obligations of the other Party are not increased by such assignment and the rights and remedies available to the other Party are not adversely affected by such assignment. Subject to that restriction, this Agreement will be binding on, inure to the benefit of, and be enforceable against the parties and their respective successors and permitted assigns.

g)  No Third-Party Beneficiaries.  The representations, warranties, and other terms contained herein are for the sole benefit of the Parties hereto and their respective successors and permitted assigns and shall not be construed as conferring any rights on any other persons.

h)  Statistical Data.  Without limiting the confidentiality rights and Intellectual Property Rights protections set forth in this Agreement, CPT has the perpetual right to use aggregated, anonymized, and statistical data ("**Statistical Data**") derived from the operation of the Software, and nothing herein shall be construed as prohibiting CPT from utilizing the Statistical Data for business and/or operating purposes, provided that CPT does not share with any third-party Statistical Data which reveals the identity of Client, Client's Class Members, or Client's Confidential Information.

i)  Export Controls. Client understands that the use of CPT's Products is subject to U.S. export controls and trade and economic sanctions laws and agrees to comply with all such Applicable Laws, including the Export Administration Regulations maintained by the U.S. Department of Commerce and the trade and economic sanctions maintained by the Treasury Department's Office of Foreign Assets Control.

j)  Severability.  If any provision of this Agreement is held by a court or arbitrator of competent jurisdiction to be contrary to law, such provision shall be changed by the court or by the arbitrator and interpreted so as to best accomplish the objectives of the original provision to the fullest extent allowed by law, and the remaining provisions of this Agreement shall remain in full force and effect.

k)  Notices.  Any notice or communication required or permitted to be given hereunder may be delivered by hand, deposited with an overnight courier, sent by electronic delivery, or mailed by registered or certified mail, return receipt requested and postage prepaid to the address for the other Party as set forth on the Bid or at such other address as may hereafter be furnished in writing by either Party hereto to the other Party.  Such notice will be deemed to have been given as of the date it is delivered, if by personal delivery; the next business day, if deposited with an overnight courier; upon receipt of confirmation of electronic delivery (if followed up by such registered or certified mail); and five days after being so mailed.

l)  Independent Contractors.  Client and CPT are independent contractors, and nothing in this Agreement shall create any partnership, joint venture, agency, franchise, sales representative or employment relationship between Client and CPT.  Each Party understands that it does not have authority to make or accept any offers or make any representations on behalf of the other.  Neither Party may make any statement that would contradict anything in this section.

m)  Subcontractors.  CPT may use subcontractors to perform Client-specific Services; provided however, that CPT shall be responsible for its subcontractors' performance of Services under this Agreement.

n)  Headings.  The headings of the sections of this Agreement are for convenience only, do not form a part hereof, and in no way limit, define, describe, modify, interpret, or construe its meaning, scope or intent.

o)  Waiver.  No failure or delay on the part of either Party in exercising any right, power or remedy under this Agreement shall operate as a waiver, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise or the exercise of any other right, power, or remedy.

p)  Acceptance.  If, when requested in writing by Client, CPT then provides any Service to Client, whether or not such Services were specified in the original Bid, , these Terms and Conditions shall apply to the provision of such Services and be deemed accepted and approved by Client concerning such Services.

q)  Survival.  Sections of the Agreement intended by their nature and content to survive termination of the Agreement shall so survive.